Four days sitting this week. We have three cases this morning. We'll see how it goes, whether we go straight through or take a break at some stage. Probably most of you are veterans of our process in one way or the other. Do watch the lighting system. Finish any questions you have when the light turns red, but otherwise the game is over and you need to sit down when the light comes on. The appellant, don't save anything for rebuttal that you don't raise in your opening because rebuttal is for rebuttal only. Probably many other things you'd be useful to say, but we'll see if you need them as we move along. I call the first case of the morning, Eric Darden v. City of Fort Worth. Mr. Keita? Good morning, Your Honors. Thank you. May it please the Court. As this Court is well aware, this case arises out of the death of Jermaine Darden, a 5'8", 340 pound morbidly obese man who was tased to death by members of the Fort Worth Police Department SWAT team during the execution of a search warrant. This Court has already concluded that genuine issues of material fact remain in dispute as to whether Jermaine was having an asthmatic seizure or whether he was actively resisting arrest. But this case presents a different but I think equally important question. If the plaintiffs can prove that the officers' actions were unconstitutionally excessive, are the facts of this case sufficiently egregious for the City to be liable for failing to train its officers? We respectfully submit that the answer is yes, and for two reasons. One, the City's own evidence, as well as the evidence that the plaintiffs submitted in response to the City's motion for summary judgment, squarely placed this case within the scope of the Supreme Court's holding in Canton v. Harris and this Court's holding in Brown v. Bryan County, as well as those of numerous other circuits. And second, an affirmance of the trial court's order under these facts would effectively eviscerate municipal liability for civil rights violations, which is clearly contrary to Supreme Court precedent, which went out of its way to create a cause of action for these offenses. Let me ask you to refine a few points for me. What is the position, based on the evidence in the record, of what action caused Mr. Darden's death? Well, the court . . . What action by officers caused his death? He was tased to death. Okay, so it was the use of a taser. Why does training as to no-knock entries, knowledge of who's inside, who's . . . why does any training matter in this case other than the training on the use of a taser? I think that's the central issue in this case, Your Honor, because the standard in Canton v. Harris for when a single incidence of misconduct can give rise to municipal liability . . . Well, tasers . . . what I'm trying to nail this down to, and maybe it can't be nailed, and you may be exactly right, that we need to look at the overall activity with all these officers and the way that they entered into the house, et cetera. But another way to look at this is that this is a taser case, and the training or lack of it that led to the death concerned tasers and not the bigger picture that you want us to focus on. There certainly is in the records substantial evidence, maybe not undisputed in some genuine dispute, maybe could be raised about its significance, of the kinds of training these officers got on tasers and other relevant law enforcement techniques. So, just tell me, why does the way they entered, the number of people entering, why does that matter on training when what caused his death was the use of a taser? Your Honor, I respectfully submit that this . . . the use of a taser under these circumstances are very different than like say, for example, an officer who is assigned to do crowd control at a concert and uses a taser to subdue an unruly attendee. Because this case arose out of a no-knock warrant, which the Supreme Court has acknowledged is an exception to the general rule. And it's an exception to the general rule because of the danger that it places both the occupants of the property but also the officers themselves. These events, these no-knock warrants and no-knock entries are inherently dangerous, and they are done by surprise. And especially in the context of this particular case, where we know the home is in a crime-ridden community, it's lower income, there's rumors that drugs are being sold there. The officers can anticipate that there is going to be a dynamic response to the people inside. Not just because they might be breaking the law, but because they live in a crime-ridden neighborhood, where more often than not, the people that are entering their homes are not police officers. And the initial surprise reaction that one might have when someone barricades down your door in the middle of a Thursday afternoon might be, for a second, to resist. To say, what are you doing here? To push back. But the problem is that it's the resistance itself that gives the officer the ability to use deadly force. So if you don't have an officer that's trained on how to engage in dynamic situations like this, you'll have an exception that essentially swallows the rule. Let me ask you, and pardon me if I'm rephrasing the same question that Judge Southwick asked. I'd like to focus on what precisely, since we're talking only about the city of Fort Worth here, not the individual officers for purposes of this appeal, what training do you believe is lacking? You just mentioned dynamic entry, and earlier Judge Southwick asked you about the training with regard to the use of the taser. I looked at your third amended complaint, and my next question is going to be, where in the complaint do you allege? Are you alleging improper training for a dynamic entry, improper training for use of the taser, improper training in providing medical care to individuals who have been the subject of the application of force? I would think all of the above, Your Honor, are contained within our failure to train in the amended complaint. I'm not looking at it as we speak, but one thing I can certainly say is that the Fort Worth Police Department is certainly aware of training that is specific and peculiar to SWAT team members. And how do we know this? Because if we look at pages 903 to 914 of the record, it shows the specific training classes that these two individual officers received. And prior to May 16, 2013, they had received some taser training, but nothing else. All of the SWAT team training that they received was after this incident. So in other words, the city of Fort Worth assembled a special unit to do these highly difficult, dangerous activities, and yet staffed it with people that hadn't received the training to do it. At the very least, I would submit that that shows that there's at least a fact issue as to whether such training was necessary. And along the same lines, because I have the same concerns that have been raised in these other two questions, you have the affidavit of Chief, is it Craig Miller? Yes, Your Honor. And Chief Miller opines that what occurred was clearly a violation of your client's constitutional rights. He talks about this dynamic environment and the SWAT team training and all of that. Where in his affidavit does he indicate what the training would look like or what the training should have been? In other words, he says they weren't trained. But what I was looking for is what would you have them know or what should they have learned or what should they have been taught that wasn't taught just by virtue of being taught how to use a taser and when to use a taser, for example? What is it that they should have done that they didn't do specifically? If you look at page 1513 of the record, which is Chief Miller's affidavit, thank you, to me to promote him. One of the things that he states is the planning processes of every dynamic entry should include target scouting, development of written detailed operations orders, order briefings, operations rehearsals, and pre-mission inspections, among others. But all of that's pre-entry. Pre-entry, correct. But your concern is what happened once they entered the premises. Correct, Your Honor. But what we know from the other evidence in the summary judgment record is that this execution, the execution of the search warrant, happened 35 minutes after it was signed. There's no evidence whatsoever that – there's direct evidence that the officers say they didn't even know who they were looking for. Their briefing sheet is blank. Let me accept all that, that they didn't do any of that. What training would have been needed in order to prevent what happened once they got inside? Your Honor, I can give you a 28-J letter after this hearing where I can detail exactly what's in Judge – excuse me, Chief Miller's affidavit, because I know that he has addressed that, but I don't have his affidavit directly in front of me. I've got it in front of me. And I just didn't see in there any place where he said specifically what the training ought to be. Even assuming that that is the case, and I'll certainly take your word for it if it's in front of you, I think the fact that there's an expert's opinion that says that training was not provided and was necessary is at least sufficient to create a fact issue before the jury. And if the other side comes back and says, hey, what could have been done differently, that's a credibility determination at the end of the day. Here the district court said, well, experts can't create fact issues in these types of cases. But if we look at the cases that have been decided by the other circuits that we've decided in our brief, they've specifically stated that expert testimony is almost inherently necessary to prove one of these cases. But isn't that the ultimate question? The expert has to offer something more than, well, they should have been trained better or they should have been trained more. I mean, that in and of itself doesn't create the fact issue. That's the ultimate issue to be tried for the jury to decide. Is that not correct? I would agree that the question of reasonableness is certainly the ultimate. Well, in this case, were they deliberately indifferent is the case to be tried. But I think that the standard for deliberate indifference here is, is the need for more or different training so obvious that the failure to provide it is likely to result in a constitutional rights violation? And I think respectfully that Judge Miller's affidavit at least gets us there with respect to – did I say judge again? Chief Miller's affidavit. You need him to be a chief for purposes. You need him to be a chief judge. Yeah. But isn't – A fourth judge would actually help me here. In terms of the training, though, don't you have to make a case of what they should have done that would have been in compliance with training? I mean, the state provides certain standards for training of police officers, doesn't it? Yes, Your Honor. Minimum amount of training for law enforcement officers? I think that's sort of the real difference that my opposing counsel and I have here is that in every case, since Brown v. Bryan County, the municipality is going to say, well, they received some training, which is sort of a – it's more of a truism than an argument. I mean, in Brown v. Bryan County, a sheriff just deputized a bunch of civilians and let them run roughshod. Well, so if now the standard is in order to satisfy your liability under Monell or to eliminate liability under Monell, all you have to do is make sure your officers go to the police academy? I mean, that's a bare minimum. And I think an expert testimony as here who says, no, more should have been done, I think that, again, that satisfies the standard. These cases will ultimately be a battle of the experts. But the district court opinion here sort of, I think, confused the standard for qualified immunity where an expert can't just come in and opine that something is objectively reasonable or not with the standard for Monell liability, which I think the other courts have appropriately and correctly stated expert testimony is necessary. Let me get a little bit more specific on something I asked you earlier. One of the things I listed in seeking what your allegation is is that they were insufficiently trained with regard to the provision of medical care to people against whom force had been used. I understood from the district court's opinion that they had an EMT unit or an ambulance unit close by in the staging area before they conducted this entry. What should they have done medically? I mean, obviously, had they called 30 seconds sooner, that might have made a difference, or 60 seconds. What other training should they have had in terms of the provision of medical care? I can give you a record site in a moment, Your Honor. I believe that there is a factual dispute here as to whether the MedStar unit was actually in place. I know there's evidence in the summary judgment record talking about how there was communication issues, and as a result of them not having everything all set up, they were not able to get the medical care for him appropriately timely. Again, that is what Chief Miller was saying in his report, is all of this stuff needs to be staged and rehearsed and done in advance so you essentially don't have a whole bunch of untrained officers breaking into someone's house and just saying whatever happens happens. Even if they had gathered some reconnaissance in advance, there's nothing to indicate that they would have had someone inside the house who was asthmatic, who had trouble breathing, who may have been predisposed to have a heart attack. I mean, they wouldn't have had that kind of information even if they had done reconnaissance. Correct, Your Honor, but that's what this court held in the previous Darden appeal, is that you take your victim as you find him. The question that the jury will ultimately answer with regard to the officer's liability is, was he resisting arrest at the time? If he was not resisting arrest and he was complying with their orders, then they had no business tasing him, because taser is essentially deadly force, and you can't use deadly force on a compliant, unarmed suspect. Well, Counselor, that gets beyond, it seems to me, the issue of this case. The issue is, did they not get adequate training on dynamic entry or however you want to talk about it? Something else not to have properly applied the training. They got taser training, and when you apply tasers or not is a general proposition not limited to dynamic entry. So if they negligently handled what they handled, that's not training against the city. Your Honor, I think the broader picture here is that it's more than just did they properly use the taser or not. Well, but that was the point you were just making, and I was trying to respond to that. What I'm arguing, I think, is I think the question that we want to put before the jury is, if the city's officers were properly trained and the people in charge of making the decisions as to whether to authorize a no-not warrant or to execute this warrant in the way that they did, they had been properly trained, this incident would not have happened. Let me ask you about the medical piece before your time runs out. It seems to me you're arguing, as you just did, about not properly arranged for the medical assistance. Are you also arguing that the officers should have recognized Dorden's distress and done something more rapidly than they did? I would argue that after they—the evidence seems to be that after he was tased, they did not treat him appropriately. He was clearly out of breath, gasping for air. He wasn't seated upright. He was allowed to lie on his stomach prone during this position. You have expert testimony supporting that's what should have happened. I believe that's the—exhibit two to our summary judgment evidence. That's the second affidavit, Your Honor. All right, counsel. I see that I'm almost out of time. We'll take your 10 seconds back. Thank you, Your Honor. Good morning, Your Honor. May it please the Court. The death of Jermaine Dorden is a tragedy. And whenever someone dies in police custody within the city of Fort Worth, the city takes it serious because it's an impact to the city as an organization and certainly an impact to the citizens of the city of Fort Worth as a community. And so we take this very seriously, which is why the city has worked diligently in having policies in place and training in place. Appellant's main argument seems to be on the city's training program. And it vacillates between whether the training on dynamic entries and no-knock and announced entries is appropriate as well as the training on use of force. I point out to you that the training on the no-knock and the dynamic entry is not the moving force behind the injuries alleged by appellant and therefore really shouldn't be the focus. However, that being the case, since they have argued, I would point out that the city engages in a tremendous amount of training on issues such as arrest, search, and seizure. First, through the city's police academy, which is a state-mandated program for people seeking to be peace officers within the city of Fort Worth. The city goes beyond that. In certain areas where the state— Counsel, you'll agree that the information collected pre-entry can be very important. Yes, sir. For instance, in this case, we had a pregnant woman inside the house. Yes, sir. Children were inside the house. Yes, sir. It would be important to know that before entry. Yes. And, in fact, your policy requires—has some requirement that there's some information like that which is collected before entry. Yes, sir. Correct? The record would show that prior to the entry, there was a briefing. Appellant says that there are certain things about whether or not police officers should have known there was a pregnant person or should have known that there were children. They did know that there were people who had sold drugs and that there were lookouts, that they believed that there were lookouts, which were very important for the officer's safety. And those things were said to officers. But the reason they went in is because there was a hand-to-hand buy? Yes, sir. And the record does show that. What was urgent about entry that you needed to execute a no-knock warrant on a hand-to-hand buy for a $20 sale of drugs? So, there have been several buys. I think the record will show you at that location. So, let's say there were three hand-to-hand $20 buys. Right? Yes, sir. What's the urgency? So, in the experience of these police officers who obtained the no-knock warrant from an independent judge, there was a concern that because of the lookouts who could tell and inform them and the people, the occupants of the house, that there were police officers who were knocking on the door, for instance, which would allow them to dispose of drugs. There's always the concern when there's a home that there's drugs and that there may be weapons present that could be used against police officers. And so, there's a need in these instances, as the judge found in the officers argued in the affidavit for the search warrant, that these things led to the fact that this had to be a quick entry with no knocking and no announcing, sir. So, the city would point out that the officers received substantial training, both in police academy and in continuing education. Let me ask you about the evidence on that. There is an exhibit that I think Judge McBride referred to, the list of courses the officers took by name, dates that they took them. Do we know anything else in this record about what the instruction was in those individual courses, or we just have the list on their personnel records of what courses they took? Yes, sir. There are, I don't know that there's anything specific in the record other than the officers' testimony during their depositions about the specifics of the training they received. There isn't the class, for instance, the class syllabus that's in the record. But it is, I would also point to the fact that there are general orders that are part of the record that does talk about specific things that officers are supposed to do in specific circumstances. For instance, as you talked about TASER with opposing counsel, there are some indicate there are specific general orders, and those are in the record, that tells officers things that they must do or that they should be considering at the time that they use a TASER. One of the things that the record shows and that our general orders do show is that a person who a TASER is used against, police should call for medical assistance upon using the TASER more than once. In this case, the TASER was cycled twice, and even though there was an ambulance stationed nearby, a call was made to get medical personnel there to check out Mr. Darden prior to any officer noticing that Mr. Darden was in distress. A second call went out when the officers noticed that he was in distress because the ambulance had not arrived at the time. So those are things that are in the general order. Additionally, there are things in the general orders that require officers- In terms of what the indicators were that he was in distress, he was nonresponsive after the- I don't believe that there is, and I would further point out that an appellant did not actually plead a cause of action for failure to render medical care, and the judge found that they had not plead a cause of action for it, although their summary judgment and their appellant brief seems to continue to talk about that, Your Honor. But even that being the case, again, the city called out for an ambulance when Mr. Darden was sat up, and then a second call went out. So even if they didn't notice that he was in distress immediately, they had already made the call to the ambulance to get there to at least check him out because a TASER had been used. That's a matter of policy that if it's used twice, is that correct? Yes, sir. That is in the record that when a TASER is used. And additionally, I would say that there is also in the record information about what to do when a person has been prone, that you are to sit them up. And certainly while the plaintiff appellant may think that Mr. Darden wasn't sat up quick enough, I think if you review the video, which is in the record, you would see that soon after the officers were able to handcuff Mr. Darden, Mr. Darden was sat up, and that an officer was monitoring Mr. Darden. In fact, Mr. Darden was standing right by Mr. Darden at the time that Mr. Darden became unresponsive, and an officer called out the second time for help. I'll go back to the warrant. The warrant that was applied for, did I understand correctly that this warrant was sought to explicitly make a dynamic entry into the premises? It was sought as a- That's not a regular search warrant, knock on the door and show them the paper. Right, it was a no-knock, no-knows warrant that was signed by a judge, yes. So the showing to the judge has to be not only sufficient probable cause to get the warrant, but also more so to enter in that fashion. Yes, sir. Okay. Yes, sir. So I want to point out that in the absence that one of the requirements of the appellant is to show that city officials would have been on notice of an inadequacy in their training program. To do that, they must show that there is a pattern of unconstitutional conduct that would have put the city on notice. And the appellants have failed to do that. They have not shown one other instance of unconstitutional conduct in a similar manner. But they're pleading the single incident exception, aren't they? That's where I was going, Your Honor, that they go to the single incident and what could be considered an egregious act by the police officers. But I don't think the record clearly shows that, especially when you consider the substantial training that city police officers go through. And in the cases that they point out, I'm sorry, I wanted to point out this, that there is a case that says that there's a case that points out that the training must be in recurring situations. That as long as the training is on recurring situations that police officers must deal with, then the training could be considered adequate. And when you look at the city's training program, the city provides substantial training on issues that officers deal with in their daily jobs, such as arrests, such as searching, such as seizing. And- It seems to me, Counsel, that the plaintiff's strongest argument, maybe not the only meaningful argument, but their strongest argument is the lack of training, and you need to confirm or deny that's true, on this sort of dynamic entry. Now whether that's sufficient to support the case is another question. But it does seem to me that that is a deficiency. It's at least an omission in the training that either one of these two officers got before May 2013 when this entry occurred. Do you agree with it, that there was not training to these officers on whatever would be relevant on dynamic entry prior to their entering in this way? Your Honor, I would point out that the appellants themselves have not pointed out to what deficiency exists in the training of dynamic entries. Well, you may be answering my question, and I have phrased it correctly. I'm looking for a factual statement. Did they get training? Look at all these courses, SWAT training, less than lethal use of force, et cetera. I don't know if SWAT training correlates to dynamic entry training, but they didn't get any of that until after this event occurred. Do you at least agree that factually the evidence supports that he received no training prior to this incident on dynamic entry? I would think, Your Honor, I would disagree that there is no evidence, because I believe that the officers testified in their depositions as to receiving training on how to make a dynamic entry. Certainly, if you look at the video, the manner in which they did make the entry shows that there didn't seem to be any confusion and that it was in line with the way that a dynamic entry should be handled. My best recollection in connection with that deposition is, though, that that focused on the perspective of the officer and who was going to go in first, what they had to wear. It seemed to me that all of that was geared toward ensuring the safety of the officers involved and didn't have anything at all to do with the occupants of the residence. Is that right? Your Honor, I would say no, because one of the purposes in making a dynamic entry and why you do have to be knowledgeable about the layout of the house and things of that, which they received both training and some briefing on, is that inherently officer safety ends up being citizen safety. For instance, if there are weapons in the house, and I'm not saying that in this case there weren't, but if there are weapons in the house, the quick entry, being able to clear the room quickly, not only means officer safety, but it also means the citizen's safety, because if there are weapons, that puts officers on heightened alert. For instance, being able to clear the kitchen where drugs were present and there were several people there quickly meant that no one there got hurt, including the officers and the people that were present in that kitchen. Is it the city's position that the training and the use of the TASER in general was sufficient, that there was no need for any additional training specifically with regard to the use of the TASER when conducting a dynamic entry? Yes, sir, and that is because the training that police officers receive on TASER use is more than just classroom, it's also done in scenario-based training in a variety of different issues. So it's considered general training, but a person who's surprised, for instance, in any kind of situation poses a similar threat to the person who would be surprised at the time that there is a dynamic entry. Training is done on the TASER in a variety of scenarios so that officers could know how to address that. Would it be specific to what occurred in this situation? Not necessarily whether or not you could actually formulate a scenario such as this one where an officer walks in, there is a person who appears to be resisting, there is a struggle prior to the TASER being used. Because at that point, it's no longer the surprise. They've been on the ground for seconds, and that's when the decision to use the TASER was used, and that is in the general scope of when officers traditionally use the TASER and for which there is training provided. If there are no further questions, the city will yield its time back. Thank you for your time and attention. You have much you probably want to cover. I'll try not to keep you too long from it, but let me ask you on the medical piece. Do you agree with the ruling that you had not pled a failure? Tell me what the ruling was on a failure to plead some aspect of a claim based on medical training. I believe the judge concluded in his summary judgment opinion that the allegations in the Third Amendment complaint were not sufficient to put the city on notice of an absence of medical care. One of the things in our previous opinion that we're talking about titles, Ambassador Prado wrote, that Judge Prado wrote at the time, was the evidence suggests Darlene would not have suffered a heart attack, died, et cetera, if the officers had not tased him, forced him on his stomach, applied pressure, had been set up on his backside or allowed to sit upright. So at least there's a claim there that perhaps, at least implicit in there, is that perhaps the officers could have done more than they did. Did you make any claim in your pleading that would have addressed that, disagreeing with what Judge McBride said? I believe our pleadings are sufficient to put the city on notice that we were complaining about the fact that he was not properly cared for. Do the words failure— Based on training, though, that the officers should have been trained better to recognize the distress and how to deal with it. You're saying that? We'll have to look. Do you disagree that there's any deficiency there? Your Honor, I do not believe there's a deficiency. I will concede that there is not a bold-faced headline that says, cause of action, colon, failure to provide medical care. But I think our description and our allegations against the city discuss the fact that the officers exercised this dynamic search warrant in the first place without the proper information and under circumstances that were plainly unnecessary, and then after doing so, failed to appropriately care for Mr. Darden such that he expired before he was even made into the hospital. I think that those facts are, under the notice pleading standard, are certainly present in the Third Amendment petition. Thank you. Your Honor, I know of no case in the 31 cases that discuss the single incident exception that this Court has put out since 2000, in which a police department has created a special unit, a special task force for handling a task that is recognized by the Supreme Court as an exception to the usual knock-and-announce rule, then staffed it with persons that it did not train at all. I think that's very different from most of the attempts by plaintiffs to try and have the single incident exception apply when a citizen encounters a police officer in the course of, as my opposing counsel noted, daily activities. This is a little different. And the standard under Canton v. Harris is, is it so obvious here that there's likely to be a deprivation of constitutional rights? And we respectfully submit that it is. My opposing counsel has talked about how, I think the phrase she used was, specific general orders. General orders by their nature are not specific. They're the general principles that must apply, that all officers must follow, suggesting you may not use excessive force, you must have probable cause for an arrest. That's not a specific order. And the cases that I cited in our brief, specifically from the First Circuit and from the Tenth Circuit, have talked about every police department has general orders. A general order saying you have to obey the Constitution is not specific enough to provide the training and guidance that an officer might need under certain circumstances. In the First Circuit case, Young v. Providence, the court said yes, they received general orders on how to confront suspects, but there was no specific training on the department's specific policy that officers were expected to respond to calls in their plain clothes, such that police officers were routinely getting shot by friendly fire because they hadn't taught their officers how to deal with that particular difficult circumstance. The same thing in Allen v. Muskogee County. They essentially had a suicidal suspect, and they provided this person, the team that was dispatched, no training on how to confront an armed, emotionally disturbed person such that additional persons were killed. Yes, those departments had general orders. They all do, and they all received some training. Presumably, they all went to a police academy. But sometimes it's just not enough. And I think the question that all three of you have asked me at one point in time about has Chief Miller provided anything in his affidavit that talks about what could have been done differently, what training would have been done? I think the answer is what he discusses. This is officer-created jeopardy. The training that they should have received would have cautioned them against doing this dynamic entry in the first place. My opposing counsel referenced lookouts. If you look at Chief Miller's report, he discusses the evidence that there is no evidence that there were any lookouts present. So understanding if the officers had arrived on the scene and there were a whole bunch of people watching for the cops, perhaps it made sense that you needed to get in there quickly before everybody was tipped off and they got all the drugs out. But with no lookouts present and three $20 drug buys, was this particularly necessary? I will respectfully submit, Your Honors, that that's a fact question for the jury to resolve. The summary judgment should be reversed, and this case should be allowed to go to trial. Counsel, can I ask you, you mentioned earlier that you were going to submit a 28-J letter, I think in response to one of Judge Graves' questions. I'm looking at, in your third amended complaint, there's a section right before Paragraph or Allegation 48. It is entitled Failure to Train by the City of Fort Worth, Count 2, and it provides the statutory citation. Paragraphs 48 through 59 are the allegations related to the City of Fort Worth. And I don't see in there, and my question is, upon what are you relying to make a claim for inadequate training with regard to medical care or the provision of medical care to a person against whom excessive force is used? So if you want to go back and review that and maybe make that part of your submission, that might be helpful. Yes, sir. Let me say, since this request has come from the panel, you may certainly submit a supplemental letter brief. I don't think it's a 28-J, which is to bring new authorities to our attention, but it is a supplemental letter brief that we're authorizing. And the other side will have five days to respond. Why don't you get that to us within five, and you will have five to respond. All right. Thank you, Counsel. Thank you. I'll call the next case of the morning, Henry Zook. And you can correct my pronunciation.